

**SIGNED this 30 day of November, 2009.**

_____
John C. Cook
**UNITED STATES BANKRUPTCY JUDGE**

_____

### IN THE UNITED STATES BANKRUPTCY COURT FOR
### THE EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | |
| **Prebul Jeep, Inc.** | ) | No. 09-10838 |
| | ) | **Chapter 7** |
| **Debtor** | ) | |
| | ) | |
| | ) | |
| **Jerrold D. Farinash, Trustee** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| v. | ) | Adv. No. 09-1041 |
| | ) | |
| **Danny Bensusan; Lillie Bensusan;** | ) | |
| **Haberman & Goldenberg, LLP; Brilliant** | ) | |
| **Jewelers/MJJ, Inc.; Alliance Investments** | ) | |
| **Group, LLC; TSE Group, LLC; 117 7th** | ) | |
| **Avenue, LP; 117 Seventh Avenue South** | ) | |
| **Property Co., L.P.; Alliance Investment** | ) | |
| **Group, LLC** | ) | |
| | ) | |
| **Defendants** | ) | |

### M E M O R A N D U M

This adversary proceeding was initiated by the chapter 7 trustee to recover allegedly fraudulent and preferential transfers made by the debtor to the Defendants. The proceeding is currently before the court on cross-motions for partial summary judgment on Counts II and III of the complaint,[1] which seek the recovery of allegedly fraudulent transfers. Having reviewed the motions, briefs, and other related filings, the court will grant the Defendants' motion for partial summary judgment and deny the trustee's motion for partial summary judgment.

**I.**

The undisputed facts, submitted and responded to by the parties in accordance with E.D. Tenn. LBR 7056-1, establish the following for purposes of the pending motions for summary judgment.[2]

On February 11, 2009, Prebul Jeep, Inc. ("Prebul Jeep"), Prebul Motors of Dalton, LLC, Prebul Automotive of Dalton, LLC, Prebul Imports of Dalton, LLC, Prebul Motorcars, LLC, and Prebul Infiniti of Chattanooga, LLC, filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code. Joseph Prebul was the president and sole director of debtor Prebul Jeep and the chief manager and sole member of the affiliate debtors. The debtors owned and operated several car dealerships in Chattanooga, Tennessee, and nearby cities. The debtors did business as Prebul Auto Group.

---

[1] The complaint has since been amended, but the fraudulent conveyance claims were reasserted in Counts II and III of the amended complaint.

[2] Many of the facts upon which the pending motions for summary judgment are based come not from affidavits or depositions in this proceeding but from allegations in a verified complaint originally filed by defendant Danny Bensusan in the Circuit Court for Hamilton County, Tennessee, against Joseph Prebul and others. To the extent that the Defendants and trustee accept such allegations as true and incorporate them in their statements of undisputed facts, the court will decide the motions for summary judgment based on those facts.

Prebul Jeep maintained an account in its name called a Chrysler Cash Management Account ("Chrysler CMA"). The Chrysler CMA was an account offered by Chrysler Financial to dealerships to allow dealers to offset loans owed by the dealer to Chrysler for financing dealer floorplans and inventory. Prebul Jeep also maintained a checking account at FSG Bank in Chattanooga, Tennessee.

Over the course of several years, Joseph Prebul induced his brother-in-law, Danny Bensusan, to invest $15,497,925.00 in the Chrysler CMA. The money came not just from Danny Bensusan, but also from Lillie Bensusan (Prebul's sister) and other entities under Danny Bensusan's control (collectively, the "Defendants"). Mr. Prebul represented to Mr. Bensusan that the Chrysler CMA could deliver interest rates above those offered by traditional banks and that any money so invested, as well as the interest earned, could be readily withdrawn. Mr. Prebul further represented to Mr. Bensusan that the invested money would remain segregated within the Chrysler CMA and would not be used for other purposes.

To get the money into the Chrysler CMA, the Defendants would wire funds (or send them by overnight courier) to Prebul Jeep's FSG Bank account. The understanding was that the funds would then be transferred from the FSG Bank account to the Chrysler CMA.

Of all the money sent by the Defendants to Prebul Jeep's FSG Bank account, approximately $3,450,000 were never transferred to the Chrysler CMA. Another $4,022,657.44 were transferred from the FSG Bank account to the Chrysler CMA only to be diverted (at a later date) back to the FSG account or removed for Mr. Prebul's personal use. Some of the funds were used to pay down the debtors' expenses, including Mr. Prebul's salary and compensation. Other amounts were disbursed for expenses related to Mr. Prebul's airplanes and real estate properties, and to pay off Mr. Prebul's (and his wife's) credit card accounts. Throughout this time period, the chief financial offi-

3

cer and the controller of Prebul Auto Group provided false monthly statements to the Defendants showing fictitious balances of the Defendants' funds in the Chrysler CMA and false confirmations showing deposits of the Defendants' funds into the Chrysler CMA.

On six occasions, various Defendants withdrew some of their investments. In most cases, the money transferred to those Defendants came from Prebul Jeep's FSG Bank account.[3] The transfers, totaling $ 9,150,000, are summarized below:

| DATE | AMOUNT ($) | TRANSFEREE |
|---|---|---|
| 5/4/2006 | 2,000,000 | Brilliant Jewelers/MJJ Inc. |
| 7/10/2007 | 600,000 | TSE Group, LLC |
| 10/15/2007 | 1,700,000 | Alliance Investment(s) Group, LLC |
| 3/13/2008 | 300,000 | Danny and Lillie Bensusan |
| 7/23/2008 | 1,550,000 | Haberman & Goldberg, LLP |
| 7/29/2008 | 3,000,000 | Danny and Lillie Bensusan |

The last withdrawal led to the Defendants' discovery of the fraudulent scheme. Danny Bensusan requested a $5,000,000 withdrawal from the Chrysler CMA. When he only received $3,000,000, he contacted Joseph Prebul and asked why the additional $2,000,000 had not been transmitted. Although a June 2008 statement provided to the Defendants by Mr. Prebul and the debtors showed a Chrysler CMA balance of over $12,000,000, Mr. Prebul admitted to Mr. Bensusan that the Chrysler CMA was out of money.

---

[3]Regarding the first transfer, it appears that the money came half from the Chrysler CMA and half from the FSG Bank line of credit.

Of the total amount of money sent by the Defendants for investment in the Chrysler CMA, at least $7,472,657.44, exclusive of interest, was not returned to the Defendants.[4] On or about August 5, 2008, Joseph Prebul delivered a promissory note to Danny Bensusan in the amount of $7,641,362.48 and personally guaranteed the repayment of the money to Mr. Bensusan.

In February 2009, criminal charges were filed against Mr. Prebul arising from the fraudulent scheme. A few days thereafter, the debtor dealerships, which had lost approximately $1,500,000 between 2006 and 2008, filed their bankruptcy petitions.

In this proceeding, the trustee seeks to recover $9,150,000 from the Defendants by avoiding the six transfers referenced above. Counts II and III of the trustee's complaint allege that the transfers should be avoided as fraudulent transfers under both state and federal law, and the trustee seeks summary judgment on those counts. The Defendants, however, counter with their own motion for summary judgment on Counts II and III. They contend that the fraudulent transfer counts should be dismissed because the undisputed facts establish that Prebul Jeep received reasonably equivalent value for the transfers, that the transfers were not made by Prebul Jeep with actual intent to defraud other creditors, and that, even if Prebul Jeep made the transfers with actual intent to defraud other creditors, the Defendants were transferees who took the transfers in good faith and gave value to Prebul Jeep in exchange for the transfers.[5]

---

[4] It is not entirely clear from the record, but obviously some interest must have been included in these figures since the Defendants transferred nearly $15.5 million and the withdrawals plus the remaining obligation equal approximately $16.6 million.

[5] The trustee also moves for summary judgment on the Defendants' "express trust" defense. In light of the disposition of the fraudulent transfer claims, as well as the Defendants' need for more discovery, summary judgment will be denied on that issue without prejudice. *See* Fed. R. Civ. P. 56(f).

## II.

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see* Fed. R. Bankr. P. 7056. All reasonable inferences are drawn in favor of the non-moving party. *Waeschle v. Dragovic*, 576 F.3d 539, 543 (6th Cir. 2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In the context of cross-motions for summary judgment, this means that the court must "draw all reasonable inferences against the party whose motion is under consideration." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (citations and internal quotations omitted). Nevertheless, "[t]he fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other." *Id.*

## III.

The trustee seeks to avoid the six transfers listed above as fraudulent, both constructively (fraud in law) and actually (fraud in fact). For support, he invokes the federal avoidance provision of 11 U.S.C. § 548(a)(1):

> The trustee may avoid any transfer . . . made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
>
> (A)  made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
>
> (B)   (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

>   (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
>   (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>
>   (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>
>   (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

The trustee also relies on 11 U.S.C. § 544(b)(1), which permits the avoidance of transfers "voidable under applicable law by a creditor holding an unsecured claim." Through this provision, the trustee invokes two Tennessee avoidance rules: Tenn. Code Ann. §§ 66-3-305 and 306, both of which largely parallel § 548(a)(1). Tennessee's avoidance provisions derive from the Uniform Fraudulent Transfer Act, Tenn. Code Ann. §§ 66-3-301 *et seq.*, a model statute so closely resembling § 548 that the two are generally construed in consonance. *See Creditor's Comm. of Jumer's Castle Lodge, Inc. v. Jumer*, 472 F.3d 943, 947 (7th Cir. 2007).[6]

---

[6] Though this familial affinity largely obviates the need for separate analysis of the federal and state avoidance provisions, there are two notable differences in the statutes. First, the federal reach-back period is two years, 11 U.S.C. § 548(a)(1), whereas Tennessee's reach-back period is four years, Tenn. Code Ann. § 66-3-310. Thus, as the trustee acknowledges, the first transfer (occurring on May 4, 2006) lies beyond § 548's temporal scope but within the purview of Tennessee law. Second, § 544(b), the vehicle for accessing state avoidance statutes, is only available if a creditor with an allowable claim could have avoided the transfer under applicable law. Although no doubt such a creditor existed, the undisputed facts submitted by the parties did not address this requirement.

**A**.

The trustee first argues for avoidance under the theory of constructive fraud. On this issue, § 548 of the Bankruptcy Code and Tennessee law both require the transferor's insolvency (or resulting or impending insolvency) and a transfer for less than "reasonably equivalent value." 11 U.S.C. § 548; Tenn. Code Ann. §§ 66-3-305, § 66-3-306.[7] Neither requirement has been met.

The evidence fails to establish that Prebul Jeep was insolvent at the time of each fraudulent conveyance. Although the debtor car dealerships lost $1,500,000 between 2006 and 2008, insolvency is determined by a balance sheet test, 11 U.S.C. § 101(32)(A); Tenn. Code Ann. § 66-3-303(a)[8], and even a company that is hemorrhaging money may pass it. As such, the evidentiary record is insufficient to support a finding of insolvency.

Even assuming that the trustee can eventually meet the insolvency requirement, the transfers still could not be avoided as constructively fraudulent because they were made in exchange for "reasonably equivalent value." Both Tennessee law and § 548 explicitly define "value" to include the payment of an antecedent debt. 11 U.S.C. § 548(d)(2) ("'value' means . . . satisfaction or securing of a present or antecedent debt of the debtor"); Tenn. Code Ann. § 66-3-304(a) ("[v]alue is given for a transfer . . . if . . . an antecedent debt is secured or satisfied"). Such a payment reduces a debtor's contractual liability to a creditor, meaning that the debtor (and, by extension, the estate)

---

[7]Section 66-3-306(b), dealing with insiders, does not make "reasonably equivalent value" an element. However, neither brief specifically relies on this section, and the evidence does not establish "insolvency" or that an insider-transferee "had reasonable cause to believe that the debtor was insolvent." Tenn. Code Ann. § 66-3-306(b).

[8]Under Tennessee law, a presumption of insolvency may also be established where "[a] debtor . . . is generally not paying his or her debts as they become due." Tenn. Code Ann. § 66-3-303(b). But this argument has not been raised and no evidence was submitted on point.

is neither richer nor poorer for having executed the transaction. *Official Comm. Of Unsecured Creditors of Propex, Inc. v. BNP Paribas (In re Propex)*, Bankr. No. 08-10249, Adv. No. 08-3070, 2009 WL 562595, *2 (Bankr. E.D. Tenn. Mar. 5, 2009). The same holds true when a defrauding entity pays money to its victim. Such payments do not reduce a contractual liability, but they do reduce claims for restitution held (knowingly or not) by the victims. *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 595 (9th Cir. 1991). Just like any other antecedent debt, the debtor's payments have no impoverishing or enriching effect, because every dollar paid to the unwitting victim reduces that victim's later claim for restitution. Mark A. Dermott, *Ponzi Schemes and the Law of Fraudulent Transfers*, 72 Am. Bankr. L.J. 157, 166 (1998).

Relying on these principles, the Defendants contend that the Debtors received "reasonably equivalent value." It is undisputed that the Defendants were induced through misrepresentations to transfer over $15 million into accounts belonging to Prebul Jeep. Under Tennessee law, this gave rise to a countervailing right to restitution for the benefit conferred. *See e.g., Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005). As such, the Defendants possessed colorable claims for restitution against Prebul Jeep for the amount of their "investment." *Jobin v. McKay (In re M&L Bus. Mach. Co.)*, 84 F.3d 1330, 1341-42 (10th Cir. 1996) (finding defrauded investor had "a colorable claim to recover the amounts that he invested" on theories of restitution and rescission); *Merrill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843, 857 (D. Utah 1987) (noting, in a similar context, that "[f]rom the time a defendant entrusted his money to the debtors, he had a claim against the debtors for the return of his money"). All subsequent transfers from Prebul Jeep to the Defendants, then operated to reduce this liability. *See, e.g., Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008) (noting, in fraud context, that "[p]ayments up to the amount of

9

the initial investment are considered to be exchanged for 'reasonably equivalent value,' and thus not fraudulent, because they proportionally reduce the investors' rights to restitution"); *M&L Bus. Mach. Co.*, 84 F.3d at 1340-42; *United Energy Corp.*, 944 F.2d at 596; *Fisher v. Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 871-72 (Bankr. N.D. Ill. 2000).

The trustee responds that these principles have no application here, because Prebul Jeep has no liability to the Defendants. Rather, he posits that Joseph Prebul alone defrauded the Defendants, and Prebul Jeep simply paid Mr. Prebul's liability for restitution. Although the payment of a third party's debt may constitute "reasonably equivalent value," *Lisle v. John Wiley & Sons, Inc. (In re Wilkinson)*, 196 F. App'x 337, 342-43 (6th Cir. 2006), the *gratuitous* payment of a third-party's obligation cannot, *In re Supplemental Spot, LLC*, 409 B.R. 187, 200 (Bankr. S.D. Tex. 2009) (finding no "reasonably equivalent value" for business debtor's payments of its principal's mortgage debt where debtor never operated or received any benefit from the property). Thus, if the trustee were correct, then Prebul Jeep's transfers would not have been for "reasonably equivalent value."

The trustee's position, however, is untenable in light of undisputed facts showing that Prebul Jeep was intimately involved with, and benefitted from, the fraud. Although Joseph Prebul may have been the one who concocted the fraudulent scheme and who initially induced the Defendants to wire their money to the corporate FSG Bank account for investment in the Chrysler CMA, that proves little because companies can only act through their agents, and Mr. Prebul was, at all times, in complete control of the debtor dealerships. Further, Mr. Prebul did not work in a vacuum, because high-ranking Prebul Auto Group employees also participated in creating false financial statements and erroneous confirmations to mislead the Defendants. Finally, and most importantly, all of the funds went straight into Prebul Jeep's coffers (either in the FSG Bank account or the Chrysler

10

CMA). From there, portions of the funds were used to cover the dealerships' expenses. Even the funds in the CMA Account (an account belonging to Prebul Jeep) were merely earning interest to offset obligations owed to Chrysler. As such, Prebul Jeep was the actual, direct recipient of the funds fraudulently obtained by its principal, and the debtor owed an obligation for the return of the funds. *See, e.g.,* 10 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 4886 ("The fraud and deceit of the officers and agents of a corporation, performed in the course of their employment, and for the benefit of the corporation, is imputable to the corporation, although it may have been unauthorized."). The fact that Mr. Prebul personally signed a promissory note in favor of the Defendants for the amount of the loss does not absolve Prebul Jeep from its own liability to the Defendants.[9]

In sum, the undisputed facts show that Prebul Jeep, through the fraudulent acts of its principal and employees, received over $15 million from the Defendants. From the moment of receipt, Prebul Jeep owed the defrauded Defendants a commensurate obligation for the eventual return of the funds. Their subsequent transfers reducing this obligation constituted an exchange of "reasonably equivalent value," thereby precluding avoidance for constructive fraud.[10]

---

[9]Relying heavily on *Farinash v. Silvey (In re Silvey)*, 378 B.R. 186 (Bankr. E.D. Tenn. 2007), the trustee also argues that there was no "exchange." But *Silvey* is inapposite. In that case, the question was whether a transfer of property ownership (from individual ownership to tenants by the entirety) was intended to be "in exchange for" a subsequent benefit (obtaining a loan). *Id.* at 187-88, 192-95. Here, the "exchange" was clear and immediate: the Defendants received part of their funds back and Prebul Jeep correspondingly reduced its obligation to return the funds.

[10]The trustee also briefly asserts a lack of "good faith," based solely on the fact the transfers to the Defendants came from the FSG Bank account. This fact, however, does not suggest a lack of good faith. The Defendants had initially wired their funds directly to that account; receiving payments back from the same account is not a ground for suspicion.

11

**B.**

Alternatively, the trustee asserts that the transfers may be avoided as involving actual fraud. For support, the trustee relies largely on a line of cases holding that proof of a Ponzi scheme constitutes proof of actual fraud. *See, e.g., Emerson v. Maples (In re Mark Benskin & Co.)*, 59 F.3d 170, (6th Cir. 1995) (unpublished table decision) *available at* 1995 WL 381741, *5 ("One of the circumstances that unequivocally evidences fraudulent intent is the debtor's pursuit of a classic Ponzi scheme."). But the presumption is not available here. First, there is no actual evidence of a Ponzi scheme and key indicia, such as astronomical rates of return and earlier creditors being paid from investments of later creditors, are absent. *See In re Taubman*, 160 B.R. 964, 978 (Bankr. S.D. Ohio 1993) (describing Ponzi schemes). Second, the presumption is generally inappropriate where the Ponzi scheme constitutes a small part of a larger, legitimate business. Mark A. Dermott, *Ponzi Schemes and the Law of Fraudulent Transfers*, 72 Am. Bankr. L.J. 157, 175 (1998) (citing *Barber v. Union Nat'l Bank (In re KZK Livestock, Inc.)*, 190 B.R. 626 (Bankr. C.D. Ill. 1996)).

Aside from the Ponzi presumption, the facts also fail to show actual intent. Joseph Prebul may have fraudulently induced the Defendants to wire money to Prebul Jeep for investment in the Chrysler CMA, but that is irrelevant. The concern for avoidance law is an actual intent to hide assets from a creditor. Thus, "'it is important to distinguish between debtor's intent while engaging in the scheme to provide funds for the Debtor's operations and his intent in using those funds so generated to pay the Debtor's creditors. His intent in generating funds may not be the same as in spending the funds.'" *Henry v. Lehman Commercial Paper, Inc. (In re First Alliance Mortgage Co.)*, 471 F.3d 977, 1009 (9th Cir. 2006) (quoting *KZK Livestock, Inc.*, 190 B.R. at 628). Here, nothing suggests that Prebul Jeep had an intent to defraud other creditors when it transferred money back to the

12

Defendants. Indeed, the other creditors, far from losing out, probably benefitted from the influx of cash generated by the fraud.

In any event, even if actual intent did exist, the conveyance would still stand. Section 548(c) provides that "a transferee . . . that takes for value and in good faith . . . may retain any interest transferred . . . to the extent that such transferee . . . gave value to the debtor in exchange for such transfer." 11 U.S.C. § 548(c). Tennessee law has an analogue: "A transfer or obligation is not voidable under § 66-3-305(a)(1) against a person who took in good faith and for a reasonably equivalent value." Tenn. Code Ann. § 66-3-309(a). As discussed above, the transfers were all in exchange for "reasonably equivalent value." Also, it appears from the facts that the transfers were received by the Defendants' in "good faith." Therefore, even if actual fraud existed, the transfers could not be avoided.

**IV.**

For the foregoing reasons, the court will enter a separate order denying the trustee's motion for partial summary judgment and granting the Defendants' cross-motion for partial summary judgment, dismissing Counts II and III of the complaint.

###